UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

DALE W. GORDON,                    Case No. 07-CV-4172 (PJS/RLE)

　　　　　Plaintiff,

v.

NORTHWEST AIRLINES, INC. LONG-          MEMORANDUM OPINION AND
TERM DISABILITY INCOME PLAN and               ORDER
LIFE INSURANCE COMPANY OF
NORTH AMERICA, a Cigna Company,

　　　　　Defendants.

---

Katherine L. MacKinnon, MACKINNON LAW OFFICE, for plaintiff.

Scott R. Carlson, HINSHAW & CULBERTSON LLP, for defendants.

Plaintiff Dale W. Gordon worked for Northwest Airlines as a machinist for about five years. Gordon was covered under a long-term disability insurance policy issued to Northwest Airlines by defendant Life Insurance Company of North America ("LINA").[1] LINA also administered the policy.

Gordon began experiencing serious knee problems in 2002 and, as a result of those problems, stopped working in February 2003. LINA granted Gordon long-term disability benefits from May 2003 through May 2006, when the applicable definition of disability changed. LINA decided that Gordon was not disabled under the new definition and discontinued his benefits in June 2006.

---

[1]Some of the documents in the administrative record refer to LINA as "Cigna." For simplicity's sake, the Court consistently refers to defendant as "LINA."

Although the complaint names "Northwest Airlines, Inc. Long-Term Disability Income Plan" as a defendant, no such entity has entered an appearance in the case. The Court follows the parties' lead in treating LINA as the only real defendant.

Gordon now sues for benefits under 29 U.S.C. § 1132(a)(1)(b), the section of the

Employee Retirement Income Security Act ("ERISA") that authorizes such suits.  LINA and

Gordon cross-move for summary judgment.  For the reasons that follow, the Court grants

Gordon's motion and denies LINA's.

I.  BACKGROUND

*A.  Policy Terms*

Under the long-term disability insurance policy at issue in this case, if an insured such as

Gordon becomes "Disabled" for purposes of the policy, LINA must pay the insured a "Disability

Benefit."  Tab 56 at 215.[2]  The benefit equals two-thirds of the employee's pre-disability

earnings, less other benefits received by the employee (such as Social Security Disability

Insurance ("SSDI") benefits), and less a portion of the employee's post-disability earnings (if

any).[3]  *Id.* at 215-16, 226-27.

The policy defines "Disability" in two ways.  *Id.* at 215.  The first definition, which

applies during the first thirty-six months that an employee receives benefits, covers what is

known as "own-occupation" disability.  The second definition, which applies after an employee

---

[2]The parties jointly submitted a well-organized copy of the administrative record. Parties' Stip. Admin. Record [Docket No. 32].  The record was divided into tabbed sections, and each document in the record has a Bates number made up of "Dale Gordon Lina" followed by a five-digit page number.  Citations to the record in this opinion take the form "Tab # at #."  The page number represents the numeric portion of the Bates number, without leading zeros.  The Court is grateful to the parties for their care in assembling and organizing the record.

[3]The amount of the benefit is adjusted annually for inflation.  *See* Tab 56 at 235 (defining "Indexed Covered Earnings").

has received benefits for thirty-six months, covers what is known as "any-occupation" disability.

Own-occupation disability is defined this way:

> An Employee is Disabled if, because of Injury or Sickness, . . . he or she is unable to perform all the material duties of his or her regular occupation . . . .

*Id.* Any-occupation disability is defined this way:

> An Employee is Disabled if, because of Injury or Sickness, . . . he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience.

*Id.*

The any-occupation definition of disability is thus more restrictive than the own-occupation definition. If an employee cannot do his *own* occupation, he is entitled to disability benefits for thirty-six months. But he is not entitled to benefits after that thirty-six-month period unless he cannot do *any* occupation "for which he . . . may reasonably become qualified based on education, training or experience." *Id.*

The policy also includes a "Work Incentive Benefit" that allows an employee to work while he is receiving disability benefits and to retain a portion of his earnings. Put differently, the "Work Incentive Benefit" gives the employee an incentive to work by not reducing the disability benefit by one dollar for every dollar the employee earns. In its generally applicable provisions, the policy provides:

> If an Employee is covered for Work Incentive Benefits, he or she *may return to work* while Disabled and Disability Benefits will continue. The conditions under which an Employee may return to work and the amount of this benefit are shown in the Schedule of Benefits.

*Id.* at 226 (emphasis added).  And in the specific "Schedule of Benefits" applicable to workers

such as Gordon, a provision titled "Work Incentive Benefits" says:

> For the first 36 months the Employee is eligible for a Disability
> Benefit, the Disability Benefit is as figured above [i.e., it is 2/3 of
> the employee's salary, less certain offsets].  If for any month
> during this period, the sum of the Employee's Disability Benefit,
> current earnings and any additional Other Income Benefits exceeds
> 100% of his or her Indexed Covered Earnings, the Disability
> Benefit will be reduced by the excess amount.
>
> After the first 36 months, the Disability benefit is as figured above,
> reduced by 50% of his or her current earnings received during any
> month he or she returns to work.  If the sum of the Employee's
> Disability Benefit, current earnings and any additional Other
> Income Benefits exceeds 80% of his or her monthly Indexed
> Covered Earnings, the Disability Benefit will be reduced by the
> excess amount figured above.
>
> Current Earnings include any wage or salary for work performed
> while Disability Benefits are payable. . . .

*Id.* at 216.

Translated into plain (or at least plainer) English, the work-incentive benefit provision

operates as follows:  During the own-occupation period (i.e., the first thirty-six months), if a

disabled employee works at some other job and earns under one-third of his pre-disability

earnings, he can keep all of his earnings.  But anything he earns over that amount will not

increase his overall income, because his disability benefit will be reduced dollar-for-dollar by

any earnings that exceed one-third of his pre-disability earnings.[4]  His overall income (benefits plus earnings) is thus capped at the total amount of his pre-disability income.

In the any-occupation period (i.e., the thirty-seventh month on), the calculations become slightly more complicated because no matter how little the employee earns, his earnings reduce his benefit payment.  The employee may keep half of a portion of his earnings — specifically, the portion up to 26 percent of his pre-disability income.  But the employee may keep none of the remainder; any earnings over 26 percent of his pre-disability income reduce his disability benefit dollar-for-dollar.  So for every $10 that the employee earns, $5 or less of it goes in his pocket.  Further, the employee's total income is capped at 80 percent of his pre-disability income.  As a result, if the employee earns 80 percent of his pre-disability income, his disability benefit completely disappears.  Thus, the mathematics of the work-incentive benefit provision effectively render the employee non-disabled — that is, not entitled to disability benefits — when he earns 80 percent of his pre-disability income.[5]

_____

[4]For example, assume that an employee earned $1,000 per month as a machinist before becoming disabled.  His disability benefit is therefore $667 per month (assuming no offsets).  Assume further that the employee earns $333 per month as a house sitter during the own-occupation period.  His income will be $1,000 (the $667 benefit plus all of his $333 in house-sitting income).  If his house-sitting income increases to $700, his total income will still be $1,000, because his benefit will be reduced by $367 (leaving him with a $300 benefit plus $700 in house-sitting income).

[5]Some examples may clarify how the work-incentive-benefit provision operates in the any-occupation period.  Suppose, again, that the employee earned $1,000 per month as a machinist before he became disabled and thus receives a basic benefit of $667.  Now suppose that the employee earns $266 per month working as a house-sitter.  His income will be $800, made up of a benefit of $534 — his basic benefit ($667) minus half of his house-sitting income ($133) — plus his $266 in house-sitting income.

If the employee's house-sitting income doubles to $532, his income will still be $800, but the benefit calculation is more complicated.  To keep the employee's income capped at $800, his benefit must be reduced by *more than* half of his house-sitting income.  His income of $800 will

(continued...)

- 5 -

Finally, the policy provides that disability benefits will end on the earliest of the following four dates:

1.      The date an Employee earns more than the percentage of his or her Indexed Covered Earnings which [is use]d to determine if an Employee is Disabled

2.      The date the Insurance Company determines an Employee is not Disabled

3.      The end of the Maximum Benefit Period

4.      The date an Employee dies

*Id.* at 225.

---

[5](...continued)
be made up of $532 in house-sitting income and a benefit of $268 — his basic benefit ($667) less half of his first $266 of house-sitting income ($133) less *another* $266.  This additional reduction of $266 equals the amount by which the employee's income *would* exceed $800 if he were allowed to keep his house-sitting income without further reducing his benefit:  The $532 in house-sitting income plus a $534 benefit (i.e., the basic benefit less half of the first $266 of house-sitting income) would be $1066, which is $266 more than $800.  And if the employee's house-sitting income reaches $800, his benefit will be reduced to zero, since his benefit plus his earnings cannot exceed 80 percent of his pre-disability earnings.

Another way of looking at this is to consider the benefit amount (roughly 67 percent of pre-disability earnings) and the employee's earnings cap (80 percent of pre-disability earnings). The difference between the benefit amount and the earnings cap is 13 percent.  Because the employee can keep half of his earnings as long as half of his earnings plus his benefit is less than the 80-percent earnings cap, if the employee earns 26 percent or less of his previous income, he keeps half of his earnings.  (Half of 26 percent is 13 percent, so the 13 percent kept by the employee plus the 67 percent benefit amount equals the 80 percent earnings cap.)  He keeps nothing of whatever he earns beyond 26 percent of his previous income, because those extra earnings reduce his benefit amount dollar-for-dollar.  So, for instance, if he earns 52 percent of his previous income, his benefit must be reduced by 39 percent (half of the first 26 percent — 13 percent — plus all of the second 26 percent). His benefit will thus be 28 percent of earnings (67 percent less 39 percent), which, when added to the post-disability earnings of 52 percent, yields income equal to 80 percent of his pre-disability income.

## B. Facts

The facts are essentially undisputed. Gordon began working as a machinist for Northwest Airlines in 1998, when he was forty-nine years old. *See* Tab 105 at 530. Before then, he worked for over twenty years as a machinist and mechanic at a company that made nuclear submarines. *Id.* Gordon has a high-school education. Tab 114 at 658.

Gordon's left knee began to give him significant trouble in the fall of 2002. In response to Gordon's complaints of pain, swelling, and stiffness, his orthopedist, Dr. Joseph T. Teynor, ordered an MRI. Tab 118 at 797-98. The MRI showed a tear in the meniscus and degenerative changes.[6] *Id.* at 795. During an office visit in late October, Teynor drew fluid off of Gordon's knee and injected the knee with a corticosteroid. In his notes about the visit, Teynor described Gordon as "majorly symptomatic." *Id.* Teynor and Gordon discussed surgical options. *Id.*

A few weeks later, in early November 2002, Teynor did arthroscopic surgery on Gordon's knee. He removed part of the medial meniscus, abraded bone surfaces in the knee, and removed "cartilaginous debris." Tab 119 at 801. At a followup visit about ten days later, Gordon's range of motion was improved, but he reported significant pain after a long walk. Tab 118 at 794. Because of some swelling in the knee or leg, Teynor ordered an ultrasound to rule out the possibility of deep-vein thrombosis or "DVT" (clotting in the veins of the leg). *Id.* at 792. The ultrasound showed no signs of DVT. *Id.* at 793.

The next week, on November 27, Teynor injected Gordon's knee with a corticosteroid to treat inflammation. *Id.* at 790. The injection helped, and as of December 2, 2002, a nurse

---

[6]The meniscus is a "C-shaped piece of cartilage" in the knee that "serves as a shock-absorption system, assists in lubricating the joint, and limits the ability to flex and extend the joint." Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Meniscus tears," http://www.nlm.nih.gov/medlineplus/ency/article/001071.htm (last visited Feb. 25, 2009).

treating Gordon expected him to be able to go back to work with restrictions about a week later. *Id.* at 791. Gordon saw Teynor on December 10 for followup, and Teynor noted that Gordon was doing well. *Id.* at 789. Teynor also noted, however, that he expected Gordon to have "further problems" because of "significant arthritis" in his knee. *Id.* Gordon apparently returned to work some time thereafter.

Gordon saw a family-practice doctor on February 28, 2003, because his knee had been growing increasingly painful for three days. Tab 120 at 702. The doctor found that the back of Gordon's knee was "[e]xquisitely tender" and referred him to Teynor. *Id.* Later that day, Teynor administered an injection to Gordon's knee and prescribed medication; he also noted that Gordon might "end up needing some major invasive procedure sooner." Tab 118 at 788.

In mid-March 2003, Gordon again went to his family-practice clinic because of knee pain. A doctor prescribed Percocet for the pain and referred Gordon to Teynor. The doctor also gave Gordon a referral for possible gastric-bypass surgery to treat his obesity. Tab 120 at 701.

Gordon saw Teynor the next day, March 18, 2003. Teynor described Gordon as having "incapacitating pain in the left knee." Tab 118 at 787. X-rays showed serious joint damage, and Teynor suggested doing knee-replacement surgery. Teynor recommended that Gordon take disability leave, noting that "[i]f he can't live without taking pain pills, he is not safe to work." *Id.*

Gordon filed a claim for disability benefits soon thereafter. Tab 83. By that time, Gordon had not been at work since February 26. *Id.* at 561. Leon Kuhni, the LINA employee assigned to handle Gordon's claim, talked to Gordon about his claim and advised him to apply for SSDI benefits. Tab 39 at 148. In early April, Kuhni engaged an outside consulting firm, Advantage 2000, to assist Gordon in applying for SSDI benefits. Tab 87 at 813.

Gordon underwent knee-replacement surgery on April 7, 2003, and the procedure seemed to go well. Tab 119 at 799-800. But a week later, Gordon went to the emergency room because of pain in his left leg. *Id.* at 380-81. The hospital ordered an ultrasound to see if Gordon had DVT. Although the ultrasound showed no evidence of DVT, Gordon was admitted to the hospital and given a blood-thinning medication (heparin) as a precaution. Tab 119 at 381.

In May 2003, Gordon went to his family practitioner, Dr. John Canfield, complaining of swelling, pain, and decreased range of motion in his left knee. Tab 120 at 621. Canfield was concerned about possible DVT and ordered an ultrasound. *Id.* The ultrasound revealed that Gordon did in fact have DVT, and Gordon was hospitalized some time between May 15 and May 19.[7] *See id.* Gordon was also prescribed a blood thinner (Coumadin) and was assigned a nurse to come to his home and to check the level of clotting factor in his blood and administer injections of Lovenox, a drug used specifically to treat DVT.[8] *Id.*

_____

[7]Records from this hospitalization are not in the record. Records from Gordon's family-practice clinic dated October 2003 refer to Gordon as having had a "pulmonary embolus and DVT left leg" in April 2003. Tab 120 at 614-15. A pulmonary embolus is a clot in an artery that supplies the lungs; DVT is the most common cause of a pulmonary embolus. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Pulmonary embolus," http://www.nlm.nih.gov/medlineplus/ency/article/000132.htm (last visited Feb. 20, 2009).

It is not clear whether Gordon's DVT caused a pulmonary embolus, which is a life-threatening condition. The administrative record does not include records of Gordon's treatment for pulmonary embolus as such. A note by a LINA claims representative, however, says that Gordon had "DVT and pulmonary embolus." Tab 48 at 175.

[8]Coumadin is a brand name of warfarin, a blood thinner that is used "to treat or prevent venous thrombosis (swelling and blood clot in a vein) and pulmonary embolism (a blood clot in the lung)." Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Warfarin," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html(last visited Feb. 25, 2009).

Lovenox is a brand name of enoxaparin and is "used in combination with warfarin to treat blood clots in the leg." Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Enoxaparin injection,"

(continued...)

Gordon went to the emergency room on May 21, 2003, just a few days after his initial hospitalization for DVT, complaining of pain and swelling in his left leg.  Tab 119 at 328.  An ultrasound showed that he still had DVT, and it had possibly gotten worse.  *Id.* at 329.  Gordon was admitted to the hospital and discharged four days later.  Tab 120 at 699.  Gordon was told on May 28 by his family-practice clinic to avoid prolonged walking and prolonged sitting. Tab 120 at 622.

A few weeks later, on June 5, 2003, Gordon called his family-practice clinic to again complain of swelling in his left leg.  Tab 120 at 620.  The clinic sent him to the emergency room where an ultrasound of his leg showed DVT remained in two arteries (the superficial femoral and popliteal).  Tab 119 at 377.  This was essentially what the previous ultrasounds had shown. *Id.* ("[T]here is no change from previous study.").  Gordon was sent home with instructions to increase his medications, elevate his leg, and follow up with Canfield.  *Id.*

Gordon saw both Teynor and Canfield on June 9.  Teynor found Gordon to have limited range of motion in his left knee and referred him for physical therapy.  Tab 118 at 762.  Teynor wrote in his notes:  "I think he is going to need to be disabled from his work for at least a few more months.  After that it is going to be hard to figure out where we can help him."  *Id.* Canfield found swelling in Gordon's left leg and increased his prescription for Lasix (a diuretic).[9]  Tab 120 at 620.

_____

[8](...continued)
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html (last visited Feb. 25, 2009).

[9]Lasix is a brand name of furosemide and is used "to reduce the swelling and fluid retention caused by various medical problems . . . ."  Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Furosemide," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html (last visited Feb. 25, 2009).

- 10 -

In late June 2003, LINA approved Gordon's claim for disability benefits, retroactive to May 28. Tab 78 at 782-83. Gordon continued to work with Advantage 2000 (LINA's consultant) to pursue SSDI benefits. Tab 44 at 156.

By late July 2003, Gordon still had only limited range of motion in his left knee. Tab 118 at 689; Tab 120 at 619. At a follow-up visit, Teynor described Gordon's condition this way: "Arthrofibrosis secondary to pain management issues and the inability to push himself but also now it is certainly markedly complicated by his history of DVT." Canfield referred Gordon back to Teynor to consider examining Gordon's knee under anesthesia. Tab 120 at 619.

In late August 2003, Gordon was seen at his family-practice clinic for swelling in both legs (in the left more than the right), but he was not in significant pain. Tab 120 at 618. The clinician reported "profound" swelling in his legs, ordered an ultrasound, and increased Gordon's Coumadin prescription. The ultrasound showed that his DVT was stable. Tab 120 at 617. Gordon was seen at the clinic again a few days later to discuss further treatment options. *Id.* The clinic referred him to a vascular surgeon for a consultation about the DVT. *Id.*

Gordon saw Teynor again on September 29, 2003. In a letter to Canfield documenting the visit, Teynor reported that Gordon's knee did not move well after the knee-replacement surgery because Gordon "has no pain tolerances . . . ." Tab 118 at 687. Teynor said that the key to Gordon's successful recovery would be "his ability to work through the pain, the normal pain of rehab." *Id.* Teynor scheduled Gordon for surgical "manipulation" of his left knee to treat Gordon's postoperative knee pain and limited range of motion. *Id.*; Tab 120 at 615-16.

The surgical manipulation took place on October 9, 2003. Tab 118 at 684. A few days later, a physical therapist found "decreased strength, decreased range of motion, and significant

gait deviations . . . ." *Id.* The therapist recommended various stretching and strengthening exercises. *Id.*

In late October 2003, Gordon again went to his family-practice clinic because of swelling in his legs. On October 27, a clinician ordered a repeat ultrasound of his left leg and a CT scan of his chest and again prescribed Coumadin. Tab 120 at 615. The ultrasound showed "persistent non occlusive DVT in the left popliteal vein," but the clinician found "no evidence of progressive DVT." Tab 120 at 614. On October 31, the clinician discontinued Gordon's Coumadin prescription. *Id.*

Gordon continued to go to physical therapy in November 2003. Tab 120 at 613. His range of motion was still limited, and Teynor continued to believe that Gordon needed to "push himself" to recover. Tab 118 at 683.

Some time in January 2004, Gordon underwent gastric-bypass surgery. *See* Tab 121 at 720 (pre-operative evaluation on January 2, 2004); Tab 120 at 611. Over the next several months, Gordon lost almost seventy pounds. Tab 120 at 611.

In mid-May 2004, Gordon again saw Canfield for swelling in his left leg. *Id.* The swelling persisted despite Gordon's use of a so-called Jobst pump — a pump used with inflatable stockings designed to treat swelling in the legs.[10] *Id.* Canfield prescribed a diuretic and referred Gordon to a clinic that specialized in swelling. *Id.*

In late June and mid-July 2004, Gordon was seen at his family-practice clinic for back pain, neck pain, pain and numbness in his right arm, and weakness of his right hand. Tab 120 at

_____

[10]See *Ultramed, Inc. v. Beiersdorf-Jobst, Inc.*, 98 F. Supp. 2d 609, 610 (M.D. Pa. 1998) ("Jobst manufactured lymphedema pumps which are mechanical devices that are attached to a person's extremity in order to massage and push extra fluid from the extremity back into the body.").

607-08.  His physical exam showed a trigger point in the muscles along the top of his spine.[11]

The clinic ordered an MRI of his cervical spine, which was basically normal.  Tab 120 at 607;

Tab 121 at 717.

Gordon saw Canfield on July 30, 2004, with further complaints of numbness in his right

arm, which Canfield diagnosed as ulnar neuropathy.[12]  Tab 120 at 605.  Canfield discussed the

recent MRI with Gordon and noted that it did not explain the neuropathy.  To further assess the

problems with Gordon's right arm, Canfield ordered an electromyogram (EMG), a test that

measures electrical activity in the muscles and can reveal nerve damage.[13]  *Id.*

At the same visit, Canfield filled out a "Physical Abilities Assessment" form (or "PAA")

for LINA — the first of three PAAs that Canfield would ultimately submit.  Tab 127 at 332-33;

Tab 120 at 605.  Along its left margin, the PAA lists several activities, such as sitting, standing,

walking, reaching, lifting, and carrying.  Following each of those activities appears a horizontal

row of five check boxes.  The first check box allows the doctor to indicate that the activity is

"not applicable" to the diagnosis.  Presumably, a doctor would check this box if, for example,

---

[11]"Trigger points are discrete, focal, hyperirritable spots located in a taut band of skeletal muscle.  The spots are painful on compression and can produce referred pain, referred tenderness, motor dysfunction, and autonomic phenomena."  David J. Alvarez, D.O. & Pamela G. Rockwell, D.O., *Trigger Points: Diagnosis and Management*, 65 Am. Family Physician 653, 653 (Feb. 15, 2002), *available at* http://www.aafp.org/afp/20020215/653.html.

[12]Ulnar neuropathy "is a problem with the nerve that travels from the wrist to the shoulder."  Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Ulnar nerve dysfunction," http://www.nlm.nih.gov/medlineplus/ency/article/000789.htm (last visited Feb. 20, 2009).  Symptoms may include:  "abnormal sensations in the [fourth] or [fifth] fingers[; n]umbness, decreased sensation[; t]ingling, burning sensation[; p]ain[; and w]eakness of the hand . . . ."  *Id.*

[13]U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Electromyography," http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (last visited Feb. 25, 2009).

- 13 -

the activity was reaching, and the diagnosis was an arthritic toe.  The next three check boxes are for indicating whether, in an eight-hour workday, the person being assessed can do the particular activity (a) continuously, (b) frequently, or (c) occasionally.  For some reason, "never" is not given as an option.  The final check box allows the doctor to indicate whether "objective findings" supported the assessment regarding the particular activity.

Canfield indicated on the PAA that he completed in July 2004 that Gordon could do several activities continuously:  sitting, reaching, fine manipulation, simple grasping, firm grasping, lifting up to fifty pounds, and carrying up to twenty pounds.  Tab 127 at 332.  With respect to the activities of standing, walking, lifting over fifty pounds, and carrying over twenty pounds, Canfield checked only the boxes for "supported by objective findings."  Canfield neglected to check any of the three boxes that would indicate *what* was supported by objective findings.  *Id.*

As noted, the form contains no column for "never," and logically such a column would appear to the right of the "occasional" column — the same place that the "objective findings" column appears.  Perhaps by leaving the three frequency-related boxes blank but checking the "objective findings" box, Canfield meant that Gordon could never do the particular activity.[14] But it would be strange for Canfield to say that Gordon could never stand or walk, given that he was not bedridden.  Canfield's meaning is simply not clear.

---

[14]This appears to be how an occupational therapist filled out a PAA in March 2005.  Tab 125.  On that form, the boxes for lifting and carrying are filled out in such a way that Gordon's reported ability decreases as the activity gets harder.  For instance, for lifting 10 pounds, "continuously" is checked; for lifting 11-20 pounds, "frequently" is checked; for lifting 21-50 pounds, "occasionally" is checked; and for lifting 51-100 and 100+ pounds, only the box for "supported by objective findings" is checked.  The most logical way to read this form is as indicating that Gordon is totally unable to lift over 50 pounds.

Canfield did indicate on the PAA that Gordon could only occasionally climb ladders and stairs, balance, and stoop. *Id.* at 333. With respect to climbing, Canfield wrote, "leg gives out" in the "objective findings" column. *Id.* And Canfield wrote "unable" in the "objective findings" column with respect to the activities of kneeling, crouching, and crawling. *Id.*

In the comment section of the PAA, Canfield wrote: "Left total knee arthroplasty [with] weakness/stiffness limits physical functions." *Id.* In his clinic notes from the July 30 visit, Canfield wrote: "Walking causes severe interscapular pain . . . . The bottom line is he can't stand due to back pain. He can't walk due to knee pain. He can't lift due to his back. He can't carry things due to weakness and muscle balance loss." Tab 120 at 605.

Gordon himself completed a claim form for LINA in early August 2004. Tab 76 at 596-98. He said that he could not work at his own or any occupation because he was "unable to have full range of motion in left knee" and because "after standing or walking I develop[] back pain." *Id.* at 596. He indicated that he used handrails, an elevated toilet seat, and pneumatic compression boots three times a week to control swelling in his legs. *Id.* He also indicated that he took hydrocodone, a narcotic painkiller, as needed. *Id.* at 598.

In mid-August 2004, Canfield completed a second PAA for LINA. Tab 126 at 646-47. Like the earlier PAA, this one was far from clear. Canfield checked *no* boxes with respect to standing and walking, and again checked only the "supported by objective findings" boxes with respect to lifting over fifty pounds and carrying over twenty pounds. *Id.* at 646. With respect to climbing stairs and ladders and balancing, this PAA said that Gordon could do those activities continuously, flatly contradicting the earlier PAA — and, it must be noted, contradicting all of the evidence in the record. *Id.* at 647. (It is inconceivable, based on the evidence in the record, that Gordon could "continuously" climb stairs or ladders.) With respect to stooping, kneeling,

- 15 -

crouching, and crawling, Canfield checked only the "supported by objective findings" box, not any of the other boxes. *Id.* On the previous PAA, by contrast, Canfield had written "unable" in the "objective findings" box for three of these activities (kneeling, crouching, and crawling) and had checked "occasionally" for the activity of stooping. Tab 127 at 333. Again, it is impossible to know what Canfield intended to say on these two PAAs about Gordon's abilities to stand, walk, climb, balance, stoop, kneel, crouch, or crawl.

In late August 2004, Gordon went to the emergency room with severe pain and swelling in his groin. Tab 119 at 372. He had a hernia. Emergency-room personnel treated the hernia and recommended to Gordon that he have outpatient surgery to repair the hernia more permanently. *Id.* at 373. Gordon followed the recommendation and had hernia-repair surgery on August 30, 2004. *Id.* at 370-71.

Also in late August 2004, LINA decided to provide services to Gordon to help him find work. Tab 52 at 187-88. Internal LINA notes express the view that it is "doubtful" that Gordon could return to a medium-duty occupation. Tab 75 at 698. In October 2004, a vocational-rehabilitation counselor at LINA, Christine Kampi, began working with Gordon. Tab 51 at 186. Kampi and Gordon discussed training him for sales or insurance work. *Id.* Gordon expressed interest in being trained for hospital-equipment repair, but Kampi said that the job would involve "some walking/standing," and that LINA would not train him for a job that he might not be physically capable of doing. Tab 49 at 184.

In October 2004, LINA also referred Gordon to a company called Intracorp for additional vocational assistance. Tab 53 at 190. A screening questionnaire prepared by Sandra Schimizzi, an Intracorp employee, describes Gordon as having "sedentary restrictions" and says that Gordon "has no transferable skills that transfer to the labor market that match his physical

limitations." Tab 114 at 660.  Schimizzi also noted that she needed clarification of Canfield's

mid-August PAA.  *Id.*  When Kampi followed up with Canfield about the PAA, Canfield

responded that Gordon would need to make an appointment so that Canfield could fill out a new

form.  Tab 48 at 175.

Throughout November and December 2004, Gordon worked with Kampi, Intracorp, and

Wedl Placement, a job-placement consultant.  Gordon took some insurance courses and took

exams to become licensed to sell insurance.  He passed the exam with respect to life and health

insurance, but failed the exam with respect to property and casualty insurance.  Tab 36 at 122;

Tab 47 at 173; Tab 112 at 633.  Gordon expressed interest in computer training in early

December; Kampi told Gordon on December 10 that, although LINA would test Gordon's

existing computer skills, it would not provide any more computer training at that time.  Tab 33

at 113; Tab 32 at 111.  A few days later, John Wedl of Wedl Placement suggested to Kampi that

he try to place Gordon in a quality-assurance position.  Tab 31 at 110.  But Kampi did not think

Gordon would be physically able to do such work; Kampi also did not think that insurance sales

would be a good fit.  *Id.*  She suggested claims administration, and Wedl agreed to follow up.

Wedl also agreed to test Gordon's computer skills.  *Id.*

In late December 2004, Kampi asked a nurse case manager to follow up with Canfield to

clarify the PAA he filled out in mid-August.  Tab 30 at 107.  Canfield declined to comment

further on Gordon's limitations and restrictions until he saw Gordon again, and he directed

LINA to put its request for more information in writing.  Tab 29 at 103.

In early January 2005, tests showed that Gordon's computer skills were poor.  Tab 24

at 82; Tab 106 at 531-40.  Wedl told Kampi he was trying to place Gordon as a parts runner or a

counter person in a parts shop, but Kampi told Wedl to stop his efforts because there was "no

evidence [Gordon] can perform this work . . . ." Tab 28 at 98. In late January, Wedl reported to LINA the results of an informational interview about working in sales that he had arranged for Gordon. Tab 104 at 527. According to Wedl, the interviewer said that Gordon would be unsuitable for even the easiest phone-sales position because he was "very unpolished." *Id.* Wedl identified two possible job leads for "sitting assembly." *Id.* at 527-28. But on January 28, Kampi told Wedl to stop trying to place Gordon in any position outside of the insurance industry, pending more information about Gordon's physical restrictions. Tab 27 at 95.

By mid-February 2005, Wedl had contacted over thirty possible employers in the insurance business, and Gordon had participated in an informational interview at State Farm. Tab 100 at 557-58. State Farm reported that Gordon was not a candidate for a sales position because he was unpolished and lacked experience. Tab 100 at 558. After conducting a labor-market survey with respect to clerical and claims-representative positions in the insurance industry in the Twin Cities, Wedl concluded that Gordon was not eligible for a position as a claims representative because he needed at least a year of customer-service or office experience. Tab 101 at 566. Wedl suggested that Gordon might be able to get office skills by working with a temp agency. *Id.* Wedl also noted that Gordon's certification with respect to life and health insurance would not be helpful unless Gordon wanted to pursue a sales position. *Id.*

Based on the report from Wedl, Kampi concluded on February 22, 2005 that vocational-rehabilitation efforts would "need to focus on past skill base [versus] development in new area." Tab 24 at 82. In light of the lack of further information from Canfield about Gordon's physical limitations, LINA had scheduled a functional-capacity evaluation or "FCE."[15] Tab 24 at 82;

---

[15]A functional-capacity evaluation or "FCE" is a test generally administered by a physical
(continued...)

Tab 97 at 435-59.  Kampi noted that, once it got the results of the FCE, LINA would need to consider whether it could develop a feasible rehabilitation plan "within [Gordon's] skills through past work history as a Machinist."  Tab 24 at 82.

Gordon underwent an FCE on February 22, 2005.  Tab 97 at 435-59.  The evaluator found that Gordon gave a reliable effort, and that his reported symptoms were consistent with his medical diagnosis and objective findings.  *Id.* at 435-36  The evaluator concluded that Gordon was unable to work as an aircraft mechanic.  *Id.* at 435.  Specifically, the evaluator found:

> Mr. Gordon requires the use of a stable object to lower and raise himself into/out of a kneeling position as well as the use of hand rails to ascend and descend stairs. . . .
>
> In order to return to work, Mr. Gordon would need to sit for 66% of the day and have the assistance of a coworker or mechanical device to lift more than 40 lbs. (30 lbs. if it is above shoulder height).  He would also need assistance with low level work as well as with reaching.

*Id.* at 435-46.

A few days after the FCE, an occupational therapist, Mary Ann Caesar, completed a PAA with respect to Gordon.  Tab 125 at 330-31.  In this PAA, Caesar indicated that Gordon could sit "frequently" (2.5 to 5.5 hours a day) but stand and walk only "occasionally" (under 2.5 hours a day).  *Id.* at 330.  Caeasar also indicated that Gordon could do several activities only occasionally: reaching, grasping firmly with his right hand, lifting 21-50 pounds, carrying 21-50

---

[15](...continued)
or occupational therapist to "objectively measure[] the evaluee's current level of function, primarily within the context of the demands of competitive employment, activities of daily living or leisure activities."  Am. Physical Therapy Ass'n, *Guidelines:  Occ. Health Physical Therapy: Evaluating Functional Capacity*,
http://www.apta.org/AM/Template.cfm?Section=Policies_and_Bylaws&CONTENTID=29717&
TEMPLATE=/CM/ContentDisplay.cfm (last visited Feb. 25, 2009), *archived at*
http://www.webcitation.org/5er6gCDyz.

pounds, climbing stairs, balancing, stooping, and kneeling.  *Id.* at 330-31.  Caesar identified only

two activities Gordon could do "continuously" (over 5.5 hours a day):  lifting ten pounds or less,

and carrying ten pounds or less.  *Id.* at 330.

In late March 2005, having reviewed the FCE, Kampi determined that Gordon would not

be able to work in a quality-assurance position (a suggestion raised by Wedl in December 2004).

Tab 20 at 73.  Kampi noted that Gordon had limited communication skills, was unpolished,

lacked sales experience, and showed no aptitude for customer service.  *Id.*  Importantly, Kampi

also noted that "wages may not reach replacement."  *Id.*

Also in late March 2005, the Social Security Administration decided that Gordon was

entitled to SSDI benefits.  Tab 91 at 336-44.  The administrative-law judge ("ALJ") assigned to

Gordon's case found his "subjective complaints" to be "generally credible."  *Id.* at 342.  The

ALJ also found that Gordon "retain[ed] a residual functional capacity for unskilled sedentary

work," defined to mean "work lifting 10 pounds frequently, standing and walking 2 of 8 hours,

and sitting 6 of 8 hours."  *Id.* (citing 20 C.F.R. §§ 404.1567, 416.967).

This finding of a capacity for sedentary work did not defeat Gordon's SSDI claim,

however, because federal regulations "direct[] a finding of disabled when considering the

claimant limited to sedentary work at age 55 with a high school education and previous skilled

work experience but no transferable skills."  *Id.* at 343 (citing Rule 201.02 in Appendix 2 to

Subpart P of 20 C.F.R. part 404).  Thus, the ALJ held that "[c]onsidering his age, education, past

work history and residual functional capacity, [Gordon cannot] perform work that exists in

significant numbers in the regional and national economy."  *Id.* at 344.  The ALJ held that

Gordon had been disabled since November 1, 2003.  *Id.*

In April 2005, Kampi closed Gordon's rehabilitation claim.  Tab 19 at 69.  She observed that Gordon had participated in training for insurance sales, but "lacks the aptitude to succeed" in the insurance industry.  She further remarked:  "No transferable skills noted."  *Id.*  At around the same time, a LINA employee noted in Gordon's file that the any-occupation period would begin on May 28, 2006 and suggested updating the medical information before then.  Tab 17 at 66.

For the next several months, LINA paid benefits to Gordon, but otherwise took no action on his claim.  In December 2005, a LINA claims manager named Dan Hissong wrote Gordon to say that LINA was again reviewing his claim because the any-occupation period would begin soon.  Tab 73 at 399-400.  Hissong enclosed a questionnaire for Gordon to give to his doctor.  *Id.*

In mid-April 2006, Canfield gave Gordon a comprehensive physical examination. Tab 120 at 325-27.  Canfield noted that Gordon's "extremities show normal range of motion and normal muscle strength" and that Gordon had no swelling in his feet.  *Id.* at 326.  Hissong called Canfield's office seeking updated medical information, but the office would not provide anything without a renewed authorization form from Gordon.  Tab 16 at 44.

In late April 2006, someone at LINA (possibly Hissong) appears to have run a "Transferable Skills Analysis" or "TSA" to identify possible jobs for Gordon.  Tab 55 at 204. No jobs were identified that would pay eighty percent of his earnings; only one job, "service dispatcher," was identified that would pay sixty percent of his earnings.[16]  *Id.*  There is no evidence in the record of how this analysis was conducted or what information went into it.

---

[16]The note reads:  "Dan — @ 80% 0 occs @ 60% 1 occ 'service dispatcher' DH 04-26-06."  Tab 55.  On the same page (a printout from a database of the average estimated wage in 2003 for dispatchers in Minneapolis-St. Paul), an even-more-cryptic note says "Urgent.  TSA wage.  DS tab has wage."

In late May 2006, Hissong instructed a nurse case manager, Charleen Deneen, to refer Gordon for an independent medical examination.  Tab 15 at 42.  But Hissong then apparently decided that LINA needed updated medical records first.  Tab 14 at 41.  Ultimately, LINA never arranged an independent medical examination (although, as discussed below, Gordon secured one on his own initiative).

On May 26, 2006, Canfield submitted a third PAA to LINA, along with a form titled "Physician's Statement of Disability."  Tab 124 at 319-23.  Canfield wrote that "continuous pain left knee limits standing, walking, bending, kneeling."  *Id.* at 319.  He noted that Gordon took Coumadin as needed (depending on his clotting-factor levels) and pain medications.  *Id.*  On the PAA, Canfield indicated that Gordon could sit, stand, and walk only occasionally (less than 2.5 hours a day).  *Id.* at 321.  Canfield also indicated that Gordon could not lift or carry more than fifty pounds; could not climb ladders, stoop, kneel, crouch, or crawl; and could not work around machinery, work overtime, or use foot controls.  *Id.* at 321-22.  Canfield identified only four activities that Gordon could do continuously:  fine manipulation, simple grasping, lifting under ten pounds, and carrying under ten pounds.  *Id.*  Canfield did not provide any restrictions on reaching; he checked the "not applicable to diagnosis" box.  *Id.* at 321.

A few days after receiving the PAA, Hissong asked a vocational rehabilitation counselor, Vincent Engel, to conduct a TSA based on the restrictions and limitations found in the PAA. Tab 13 at 39.  The referral form directed Engel to use an "earnings threshold" of sixty percent. Tab 72 at 355.  Engel performed the TSA and reported to Hissong that he identified "transferable occupations based on [Gordon's] work history, education, wage requirements and limitations and restrictions."  Tab 12 at 38.

The TSA describes Gordon's restrictions as follows:

> [Gordon] is lifting in the light to medium level of physical
> demand.  He is limited to only occasional sitting, standing and
> walking and would need a job where change of position was
> available.  He has good use of his upper extremities for reaching,
> fine manipulation, and simple grasping.  For firm grasping he is
> limited to occasional use of the [right upper extremity] due to
> weakness.  He is unable to climb ladders, stoop, kneel, crouch or
> crawl.

Tab 71 at 354.  The TSA describes Gordon's transferable skills as including:

> Knowledge of tools, machines, materials, and methods used in
> trade or craft specialty; reading scale drawings or blueprints to
> visualize objects; using shop math to calculate object dimensions,
> material amounts needed, and material costs; coordinating eyes,
> hands and fingers to use hand tools or machines in constructing,
> making, or repairing objects; and adhering to object specifications
> or standards.

*Id.*  The TSA then identifies six jobs that Gordon "can perform," four classified as "sedentary"

jobs according to the Dictionary of Occupational Titles ("DOT"), and two classified as "light"

jobs.[17]  *Id.*  The TSA says, in summary, that "[s]uitable positions were identified that meet

Mr. Gordon's skills, education, work history and wage replacement requirements."  *Id.*

Based entirely on this TSA and the May 2006 PAA from Canfield, LINA determined that

Gordon was not disabled under the any-occupation definition of disability and therefore denied

his claim.  Tab 3 at 3; Tab 11 at 37.[18]  Hissong sent a letter to Gordon on June 2, 2006, informing

him that LINA no longer considered him disabled and would stop paying him benefits as of

---

[17]The four sedentary jobs identified were:  maintenance scheduler; service clerk; service
dispatcher; and repair-order clerk.  The two light-duty jobs identified were hardware-supplies
sales representative and post-office clerk.  Tab 71 at 354.

[18]LINA assessed Gordon's functional capacity as "light duty."  Tab 11 at 37.  LINA
characterized Canfield's May 2006 PAA as showing that Gordon "is lifting in the light to
medium level of physical demand" and "is limited to occasional sitting, standing, and walking."
*Id.*

June 1.  Tab 70 at 348-50.  Hissong listed the six jobs identified in the TSA and said that because

Gordon "would be able to perform" them, he was not disabled.  *Id.* at 349.

Gordon retained counsel, and his lawyer, Diane Odeen, wrote LINA in mid-August to

protest the denial of his claim.  Tab 69 at 315-17.  Odeen argued that because of his physical

limitations, as reflected in all three of the PAAs prepared by Canfield, Gordon could not do any

of the six jobs identified by LINA.  *Id.* at 316.  Odeen submitted medical records and documents

related to Gordon's SSDI award and to his classification by Minnesota as a disabled person for

hunting purposes.  *Id.* at 317.[19]

After receiving Odeen's letter, Hissong forwarded Gordon's file to a nurse case manager

for review.  Tab 68 at 312.  Hissong asked for an opinion on whether "medical evidence sent in

on appeal support[s restrictions and limitations] past [any-occupation] date."  *Id.*  The nurse case

manager's response reads in full:

> 57 [year-old] male — airline mech[anic] appeal —
>
> * No new clinical documentation to support [restrictions and limitations] of no work[.]
>
> PAA — Dr. Canfield [primary-care physician] outlines sedentary to light capacity.
>
> TSA — [identified] 4 sedentary [and] 2 light[.]

---

[19]The copy of Odeen's letter in the record does not include attachments, and she did not itemize them very specifically.  A note in LINA's files says that Odeen also submitted "office notes dated April 13, 2006 and September 5, 2006" as well as the May 2006 PAA.  Tab 9 at 24. The April 13, 2006 office note is presumably the report of the comprehensive physical exam discussed above.

The September 5 note documents a visit by Gordon to his family-practice clinic for swelling in his left leg caused by walking.  Tab 120 at 301.  Gordon saw a physician assistant, who recommended that he wear compression stockings when walking and prescribed a diuretic. *Id.* at 302.  It seems likely that the note for the September 5 visit was sent separately from Odeen's letter, which is dated a few weeks earlier.

Tab 68 at 313.

LINA then asked a "medical director," Dr. R. Norton Hall, to review Gordon's file some

time in November. Tab 9 at 24. Hall was told that on June 1, 2006, "medical documentation

received from [Canfield] indicated that [Gordon] could function within a sedentary to light

demand level." Tab 67 at 295. Hall was asked to "[d]etermine if medical documentation on file

supports limitations imposed." Hall's response reads in full:

> Medical record review fails to reveal significant documented
> clinical findings to support a status of no work. The [claimant's
> attending physician] indicates a functionality that negates a no
> work status. Finally the [last office visit] of 9/5/06 indicates only
> 1+ edema of [lower left leg].

Tab 67 at 296.

Based on this opinion from Hall, LINA denied Gordon's appeal. Tab 66 at 292-94. In

the denial letter, dated November 16, 2006 and addressed to Gordon's counsel, LINA said that

its medical director "reviewed Mr. Gordon's entire medical chart and concluded that the medical

records fail to reveal significant documented clinical findings to support a status of no work."

*Id.* at 293. LINA told Gordon that its decision was based on information from Canfield, saying:

> Dr. Canfield, who is Mr. Gordon's treating provider, has already
> indicated that he would be able to sustain full time sedentary
> employment within the noted restrictions. Dr. Canfield has not
> retracted his earlier functional assessment or provided us with a
> letter explaining how Mr. Gordon's condition would prevent him
> from performing the occupations identified.

*Id.*

Gordon then underwent two more evaluations, one in December 2006 and one in

February 2007, before again challenging LINA's denial of his claim. Gordon saw a physical

therapist, Kari Prestholdt, in December 2006.  Prestholdt filled out a PAA form as well as a

narrative evaluation.  Tab 123 at 257-59 (PAA); Tab 116 at 260-62 (narrative evaluation).

With respect to the activities of sitting, standing, and walking, Prestholdt did not check

any of the boxes to indicate how frequently Gordon could do those activities, nor did she check

the "not applicable" box.  Tab 123 at 257.  Instead, she wrote "Please see initial evaluation for

objective findings" on the lines for standing and walking.  *Id.*  (Presumably she meant this

notation to refer to sitting as well, which is on the line above standing.)  Prestholdt also only

partially completed a portion of the PAA titled "Physical Limitations" that had checkboxes to

indicate whether, in an eight-hour day, Gordon could do specified activities for 0 hours, up to 2.5

hours, up to 5.5 hours, or more than 5.5 hours.  *Id.* at 259.  She indicated that he could not climb,

kneel, or crawl at all, but she checked no boxes for the activities of balancing, stooping,

reaching, walking, sitting, and standing.  *Id.*  Elsewhere in the PAA, however, Prestholdt

indicated that Gordon was unable to stoop, kneel, crouch, crawl, or climb a ladder, and she

described his balance as poor.  *Id.* at 258.  She also indicated that his ability to lift or carry over

ten pounds was limited.  *Id.* at 257.

Prestholdt's narrative evaluation (the "initial evaluation" referred to in her PAA) does not

include much information about sitting, apart from indicating that Gordon's seated balance was

normal.  Tab 116 at 261.  With respect to walking, Prestholdt wrote that Gordon "ambulates with

very slight limp . . ."  *Id.* at 260.  In the "assessment" portion of the form, she wrote:  "[Gordon]

demonstrates [left] knee [decreased range of motion] and strength limiting ability to squat and

ambulate [up/down] stairs reciprocally [without] having use of railing."  *Id.*

Gordon's next evaluation, in February 2007, was an independent medical examination

("IME") by Dr. Anil K. Agarwal, an orthopedic surgeon.  Tab 115 at 268-79.  Agarwal reviewed

four of the five PAA forms that had been done up to that time and examined Gordon.[20]  *Id.* at 269-70.  Agarwal was aware of Gordon's history of surgeries and hospitalizations, though he apparently did not review records for them.  *Id.* at 275.

On physical examination, Gordon's left knee showed "[c]onsiderable swelling, almost 1.5 times normal," and exhibited tenderness, crepitus (i.e., crackling), patellofemoral-joint disease, and limited range of motion.  *Id.* at 274.  Agarwal also found swelling and diminished range of motion in Gordon's right ankle, as well as numbness in the ring and pinky fingers of Gordon's right hand caused by a pinched ulnar nerve.  *Id.* at 274-75.

Agarwal concluded that he "favor[ed] total disability" for Gordon based on five conditions:  (1) his knee, (2) his gastric-bypass surgery, (3) his pinched ulnar nerve, (4) his possibly arthritic right ankle, and (5) his recurrent DVT in his left leg.  *Id.* at 275-76.  With respect to Gordon's knee, Agarwal described Gordon's knee-replacement surgery was unsuccessful because Gordon was in pain, had "[c]onsiderable swelling," and had limited range of motion.  *Id.* at 275.  Agarwal described Gordon as having "considerable lower extremity distress."  *Id.*

In March 2007, Odeen wrote to LINA to request that it reconsider its denial of his claim in light of the IME and other records.  Tab 64 at 253-54.  She enclosed a letter from Gordon in which he wrote, "It is difficult very for me to sit at a desk for any longer than one hour — my leg gets severe cramps."  Tab 65 at 285.  Gordon also said that he was scheduled for a third hernia surgery.  *Id.*

---

[20]To recap, Canfield completed three PAAs, one in July 2004, one in August 2004, and one in May 2006.  An occupational therapist, Caesar, completed a PAA in March 2005, and Presthold completed one in December 2006.  Agarwal reviewed all of these PAAs except the August 2004 PAA by Canfield.

Odeen also included a copy of Agarwal's IME report, Prestholdt's PAA from December 2006, some medical records, and evidence that Minnesota had classified Gordon as disabled for homestead purposes. *See* Tab 64 at 253. Odeen said that Gordon's "inability to stand or sit for any length of time without pain, and his total inability to stoop or kneel severely limits his ability to perform any occupation." *Id.* at 254. She asked LINA to reconsider its denial in light of Minnesota law and the findings of various government agencies that Gordon was disabled. *Id.*

A claims manager at LINA, Diana Accetta, reviewed Gordon's claim with a second medical director, Dr. Seiferth, on June 25, 2007. Tab 60 at 246-48. (LINA sent Gordon letters in April and May saying that they were working on his appeal, but the record contains no evidence of any action by LINA before June 25. *See* Tabs 61-63.) Accetta asked Seiferth, "Does med[ical] support reopen of voluntary appeal?" Tab 60 at 246. Seiferth's response reads in full:

> [Claimant] with osteoarthritis [status post left] knee [total knee replacement] on appeal of previous findings of sedentary capacity[.] Claimant submitted IME whose opinion is knee swelling [and] reduced [range of motion] (-15 – 80°) precludes [return to work]. No [provision?] of functional loss to preclude sedentary capacity is submitted. Medical does not support continued [out-of-work] restriction.

Tab 60 at 247.

The day Seiferth gave this opinion, Accetta wrote to Odeen to inform her that LINA again upheld its denial of benefits. Tab 59 at 254-55. After saying that Gordon's "entire medical record file was reviewed with a Medical Director," Odeen explained LINA's denial of benefits as follows:

> [I]t was noted that the medical information does not support his inability to perform sedentary work. It was felt that although he may have knee pain, the occupations that were identified at the

sedentary level would allow [him] to stand up and change position to get comfortable.  Sedentary occupations do not require him to use ladders and crawl as [he] has been restricted from doing so.

While there has been additional information submitted that supports Mr. Gordon's inability to perform his own occupation at the medium level due to a [*sic*] knee pain, there is no medical information that would support his impairment to perform any occupation at the sedentary level.

Tab 59 at 245.  LINA informed Gordon that his appeal rights were exhausted and that he could sue LINA if he wanted to.  *Id.*

Gordon brought this action in October 2007.

## II.  ANALYSIS

### A.  Standard of Review

Gordon challenges LINA's decision, as an ERISA plan administrator, to deny his claim for disability benefits.  The parties cross-move for summary judgment.  Accordingly, two interlocking standards of review apply in this case: the general summary-judgment standard and the specific standard that applies to federal-court review of decisions by ERISA plan administrators.

### 1.  Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir.

2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### 2.  ERISA

When an ERISA plan authorizes the plan administrator to determine eligibility for benefits, courts review the administrator's determinations for abuse of discretion. *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2006).  The insurance policy in this case provides that LINA "shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make related findings of fact."  Tab 56 at 231.  On its face, this provision seems to grant LINA sufficient discretion to entitle it to the deferential, abuse-of-discretion standard of review.  But Gordon asks the Court to disregard the provision and review his claim de novo.  Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 21-23 [Docket No. 44].  According to Gordon, although the insurance policy gives LINA the authority to determine eligibility for benefits, some document, apart from the insurance policy itself, must actually "effectuate[] the delegation" of this authority from the plan sponsor (Northwest Airlines) to LINA.  *Id.* at 23.  No such document exists in this case.

Gordon is mistaken.  In the very case on which Gordon bases his argument, *McKeehan v. Cigna Life Insurance Co.*, the Eighth Circuit said, "we require explicit discretion-granting language *in the policy* or in other plan documents to trigger the ERISA deferential standard of review."  344 F.3d 789, 793 (8th Cir. 2003) (emphasis added; quotation omitted).  And in *Rittenhouse v. UnitedHealth Group Long Term Disability Insurance Plan*, the Eighth Circuit

held that discretion-granting language in an insurance policy was sufficient to trigger abuse-of-discretion review.  476 F.3d 626, 629 (8th Cir. 2007).  As these cases make plain, discretion-granting language that appears in an insurance policy — such as the language that appears in the policy issued by LINA to Northwest Airlines — entitles an insurer to abuse-of-discretion review under ERISA.  The Court therefore reviews LINA's decision to deny benefits to Gordon for abuse of discretion.

With respect to questions of policy interpretation — i.e., questions about the meaning of terms in a policy — an ERISA plan administrator's interpretation will be upheld on review for abuse of discretion if the interpretation is "reasonable" under the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992).  The *Finley* factors are:  (1) whether the fiduciary's interpretation is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the fiduciary has consistently followed the interpretation.  *Id.* at 621.  The Eighth Circuit has directed district courts to examine all five *Finley* factors.  *Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 584 (8th Cir. 1995).

With respect to questions of policy application — i.e., questions that depend on factual conclusions — the abuse-of-discretion standard likewise requires the Court to review for reasonableness.  Such review, "though deferential, is not tantamount to rubber-stamping the result."  *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).  Rather, an ERISA plan administrator's decision must "be supported by substantial evidence that is assessed by its quantity and quality."  *Id.*

Further, when the plan administrator is also the insurer (as is LINA), the administrator has a conflict of interest that must be weighed in determining whether the administrator abused its discretion. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). The amount of weight given to the conflict depends on the circumstances of the particular case. *Id.* at 2351. For example, where an insurer has a history of biased claims administration, the presence of a conflict may be given substantial weight. *Id.* But where the record indicates that the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight. *Id.*

In *Glenn*, the record contained little evidence about the insurer's efforts to ensure accurate claims assessment. *Id.* The Supreme Court found that, in light of the absence of such evidence, the court of appeals properly gave the conflict "weight to some degree" without making it determinative. *Id.* at 2351-52. Like the record in *Glenn*, the record in this case does not indicate, one way or the other, whether LINA has taken steps to protect the claims-assessment process from being influenced by the conflict. Thus, as did the court of appeals in *Glenn*, this Court will give the conflict some, but not determinative, weight.

The Court will not, however, "weigh[] the conflict heavily" as Gordon asks. Pl. SJ Opp. at 27. The Court disagrees with Gordon about the significance of the various factors that he contends support such an approach. For instance, the fact that LINA did not pay Gordon his benefits is not an additional factor that favors weighing a conflict heavily; such nonpayment is the basis of *any* suit for benefits. The Court also does not agree that LINA "provided incorrect information about Gordon's capacity to the TSA analysis." *Id.* This is not to say that the TSA was flawless. Indeed, as explained below, the Court finds that LINA's reliance on it was unreasonable. But the person who performed the TSA was aware of Gordon's restrictions and

- 32 -

limitations.  In short, LINA's conflict is entitled to some weight in this case, but it is not determinative.

### B.  Benefits Claim

LINA concluded in its May 2006 TSA that Gordon could do six jobs, four of which were sedentary and two of which were light duty.  Tab 71 at 354.  This TSA was, and remains, LINA's primary basis for concluding that Gordon is not disabled under the any-occupation definition of disability.  Gordon disputes the TSA's conclusion on two grounds.  First, he contends that he is not, in fact, capable of doing any of the six jobs identified in the TSA.  Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 41, 45-46 [Docket No. 35].  Second, he contends that the jobs do not satisfy a wage threshold that is implicit in the policy.  *Id.* at 46-47.  The Court considers each argument in turn.

### 1.  Gordon's Capacity to Work

According to LINA, Canfield's May 2006 PAA — the most recent of the three PAAs submitted by Canfield — showed that Gordon "could perform the tasks required with sedentary or light occupation."  Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 12 [Docket No. 33].  This is manifestly false.  Because LINA based its decision on an obvious misinterpretation of the May 2006 PAA, LINA abused its discretion in denying Gordon benefits on the basis that he could do sedentary work.

It is important to note that there is no evidence in the record that LINA disagreed with the substance of Canfield's May 2006 PAA.  LINA attempts to cast doubt on the PAA in this litigation, by asserting that the May 2006 PAA "unexplainably drops [Gordon's] ability to sit from continuously to occasionally."  Def. Resp. Mem. Opp. Pl. Mot. S.J. ("Def. SJ Opp.") at 7

[Docket No. 43]. But there is no evidence in the record that LINA doubted the substance of the PAA at the time that it made its decision. Instead, LINA simply mischaracterized it.[21]

The mischaracterization began in August 2006, when a nurse case manager wrote that Canfield's PAA "outlines sedentary to light capacity." Tab 68 at 313. And in referring Gordon's claim to Hall for review, the case manager told Hall that "medical documentation received from [Canfield] indicated that [Gordon] could function within a sedentary to light demand level." Tab 67 at 295. In his cursory note about Gordon's claim, Hall said that Canfield "indicates a functionality that negates a no work status." *Id.* at 297.

Seiferth's equally cursory note suggests that he accepted uncritically the statements in LINA's file that Gordon had already been found to have sedentary capacity. Specifically, Seiferth characterized Gordon as appealing "*previous findings* of sedentary capacity . . . ." Tab 60 at 247 (emphasis added). Seiferth mentioned only Agarwal's IME, and asserted, without analysis, that "No [provision?] of functional loss to preclude sedentary capacity is submitted. Medical does not support continued [out-of-work] restriction." *Id.* And in explaining LINA's final rejection of Gordon's claim, Accetta said, "All four of the reviewed Physical Ability Assessment forms are well beyond the requirements of sedentary work." Tab 59 at 245. Accetta therefore asserted that "there is no medical information that would support his impairment to perform any occupation at the sedentary level." *Id.*

---

[21]This is not the first case in which LINA has mischaracterized medical records and erroneously asserted that a claimant's doctor supported the claimant's ability to do sedentary work. *See Juszynski v. Life Ins. Co. of N. Am.*, No. 06-CV-5503, 2008 U.S. Dist. LEXIS 24928, at *19 (N.D. Ill. Mar. 28, 2008) (holding that "LINA's contention that [the claimant's doctor] 'certified that Plaintiff was capable of performing the duties of a sedentary occupation' is not corroborated by the record" and reversing LINA's denial of disability benefits).

It is true that Canfield used the word "sedentary" in the May 2006 PAA:  With respect to the activities of lifting, carrying, pushing, and pulling, Canfield wrote that Gordon's capacity was "sedentary for all."  Tab 124 at 323.  But Canfield also checked boxes, in two separate locations on the form, to indicate that Gordon could walk, sit, and stand only occasionally — that is, less than 2.5 hours in a regular workday.  *Id.* at 321, 323.  And in the narrative accompanying the form, Canfield wrote that "continuous pain left knee limits standing, walking, bending, kneeling."  *Id.* at 319.

Contrary to the assertions made by LINA in this lawsuit, in its internal notes, and in its claim-denial letters, the May 2006 PAA does *not* show that Gordon had the capacity for sedentary work.  The PAA says that Gordon can perform *four specific activities* — lifting, carrying, pushing, and pulling — to the extent consistent with sedentary work.  But the PAA also says that Gordon cannot walk, sit, or stand more than 2.5 hours per day.  Common sense dictates that someone who cannot walk, sit, or stand more than 2.5 hours per day cannot do sedentary work.

LINA's assertions defy not only common sense.  The term "sedentary" is a term of art in the occupational context.  Social Security regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  Further, the Social Security Administration has explained that in sedentary work, "[s]itting would generally total about 6 hours of an 8-hour workday."  Social Security Ruling No. 96-9p, 1996 SSR LEXIS 6, at *9 (SSA July 2, 1996).  While rulings by the

Social Security Administration are not directly applicable under ERISA, "the guiding principles developed in [Social Security disability] cases may be instructive in ERISA cases." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 n.11 (7th Cir. 1992) (quotation omitted). Based on the Social Security Administration's definition of sedentary work, and based on common sense, the Court finds that someone who cannot sit more than 2.5 hours per day is not capable of doing sedentary work. Thus, Canfield's May 2006 PAA — which reported that Gordon could not sit more than 2.5 hours per day — certainly did not support LINA's conclusion that Gordon could perform sedentary work. Tab 124 at 321, 323.

Moreover, the TSA that is at the core of LINA's decision to reject Gordon's claim for benefits does not, properly read, support LINA's conclusion that Gordon was physically capable of doing the jobs identified in the TSA. Specifically, the TSA accurately summarizes the May 2006 PAA as limiting Gordon "to only occasional sitting, standing and walking . . . . Tab 71 at 354. The TSA then lists six occupations, four sedentary and two light duty, that Gordon ostensibly can perform.

But the TSA does not explain how Gordon can do sedentary or light-duty work if he is limited to occasional sitting, standing, and walking. In fact, it is apparent that Engel, who completed the TSA, did not consider whether Gordon was *physically* capable of the six jobs identified in the TSA. In the "Summary" section of the TSA, Engel wrote: "Suitable positions were identified that meet Mr. Gordon's *skills, education, work history, and wage replacement requirements*." *Id.* Gordon's physical restrictions are notably absent from this list of criteria met by the positions identified by Engel.

This absence may explain Engel's otherwise inexplicable conclusion that Gordon could do sedentary and light-duty jobs despite his inability, acknowledged in the narrative portion of

the TSA, to sit more than 2.5 hours per day.  Engel considered *only* whether the identified jobs were compatible with Gordon's "skills, education, work history, and wage replacement requirements" and whether they were sedentary or light duty.  Engel did not consider whether the jobs were compatible with Gordon's specific physical restrictions.[22]

LINA abused its discretion in relying on the TSA for another reason:  LINA did not attempt to square Engel's assessment of Gordon's transferable skills with evidence that he had no such skills.  Specifically, LINA's outside vocational consultant found, in 2004, that Gordon had "*no transferable skills* that transfer to the labor market that match his physical limitations." Tab 114 at 660 (emphasis added).  Kampi, LINA's own vocational rehabilitation counselor, agreed with this assessment.  She remarked, when she discontinued rehabilitation efforts in April 2005, "*No transferable skills* noted."  Tab 19 at 69.

LINA was not necessarily bound by these findings, but LINA was not free to act as if they did not exist.  The outside consultant and Kampi both worked for LINA, not Gordon, and they were therefore presumably unbiased (or, if anything, biased in favor of LINA).  In relying on the assertion by Engel — who never met Gordon — that Gordon had a long list of

---

[22]LINA's counsel asserted at oral argument that when Engel did the TSA, he directed his computer program to return only jobs that required 2.5 hours or less of sitting per day.  S.J. Hr'g Tr. at 44.  But assertions by counsel are not evidence, and there is no record evidence to support this assertion.

Having reviewed the TSA, the Court does not find counsel's assertion to be credible. The six occupations identified by Engel are all identified by their number in the Dictionary of Occupational Titles and are listed as requiring sedentary or light strength.  Tab 71 at 354.  With respect to sitting requirements, the Dictionary of Occupational Titles classifies jobs only by gross strength levels (i.e., sedentary, light, medium, heavy, and very heavy), not by how many hours of sitting per day they require, and there is no evidence on the TSA that Engel was able to classify jobs more finely than they are classified in the Dictionary of Occupational Titles.

transferable skills without considering (much less explaining) how that assertion squared with the earlier contrary findings, LINA acted arbitrarily.

## 2.  The Wage Threshold

Under the policy at issue in this case, an insured meets the own-occupation definition of disability if he or she cannot "perform all of the material duties of his or her regular occupation," and an insured meets the any-occupation definition of disability if he or she cannot "perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training, or experience." Tab 56 at 215. Although some disability-insurance policies provide coverage *either* when an employee is unable to work, *or* when the employee is able to work but is not able to earn more than a certain percentage (such as eighty percent) of his pre-disability income, the policy in this case includes no such wage-threshold provision.

Nonetheless, the June 2006 TSA that formed the basis of LINA's denial of Gordon's claim referred to his "wage replacement requirements" and identified only jobs that paid more than a monthly "wage requirement" of $3,101.74. Tab 71 at 354. This amount equals sixty percent of Gordon's monthly pre-disability earnings (adjusted for inflation). *Id.*

Gordon contends that LINA used the wrong wage threshold and should have used eighty percent instead of sixty percent. Pl. SJ Mem. at 46. LINA counters that it was not required to use *any* wage threshold. LINA points out that the policy does not define disability in terms of a wage threshold and that LINA never referred to a wage threshold in its letters to Gordon. Def. SJ Opp. at 10-11. LINA's counsel explained at oral argument that LINA chooses, as a matter of internal policy, to apply a sixty percent wage threshold when conducting a TSA (unless the policy provides for a higher wage threshold), but he denied that LINA was required to apply a sixty percent threshold — or any other threshold — in this case. S.J. Hr'g Tr. at 56-57.

If the only relevant policy language were the policy's definitions of disability, the Court would agree with LINA that the policy does not include any wage threshold, let alone the eighty percent threshold claimed by Gordon.  But the policy is internally contradictory.  True, the disability definitions do not incorporate an explicit wage threshold, but LINA *effectively* promises to provide disability benefits to claimants who cannot earn more than eighty percent of their pre-disability income through the "work incentive benefit" provision.[23]  As noted above, work-incentive-benefit provision sets out a formula for how outside earnings will reduce an employee's disability benefit during the any-occupation period.  Tab 56 at 216.  But if an employee *has* earnings from some occupation during the any-occupation period, how can the employee be disabled under the *any*-occupation definition of disability?  Put differently, if, as LINA claims, an employee is not entitled to *any* disability benefit if he can earn *any* amount of money from *any* occupation, then what is the point of the work-incentive benefit?  There is an irreconcilable conflict between the work-incentive-benefit provision and the any-occupation definition of disability.

It seems likely that this conflict is the result of sloppy drafting on LINA's part.  The work-incentive benefit would make perfect sense in a policy whose definition of disability includes an eighty percent wage threshold.[24]  But the benefit makes no sense in a policy that does

---

[23]Gordon relies on the work-incentive benefit provision to support his argument that an eighty percent wage threshold applies in this case.  Pl. SJ Mem. at 46.

[24]Indeed, the Court encountered a work-incentive-benefit provision virtually identical to the one at issue in this case in a LINA policy at issue in another case before the Court, *MacNally v. Life Insurance Company of North America*, No. 07-CV-4432 (D. Minn.).  But under that other policy, in the any-occupation period, an insured is disabled *either* if the insured cannot perform any occupation, *or* if the insured "is unable to earn more than 80% of his or her Indexed Covered Earnings."  *MacNally,* Docket No. 40, Admin. Record at 700.  The work-incentive benefit

(continued...)

not incorporate a wage threshold. When asked about the work-incentive-benefit provision at the summary-judgment hearing, LINA's counsel had no explanation for how it could be reconciled with the any-occupation definition of disability. S.J. Hr'g at 54-55. This reflected not a shortcoming on the part of LINA's counsel, but the fact that the two provisions are simply not reconcilable.

LINA's reliance on one aspect of the policy — the any-occupation definition of disability — to the exclusion of another — the work-incentive-benefit provision — is a matter of policy interpretation. The Court holds that LINA's interpretation of the policy as not including a wage threshold is not reasonable under the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992). Most important, LINA's interpretation is contrary to the plain language of the work-incentive-benefit provision and renders that provision meaningless with respect to the any-occupation period. Further, the interpretation conflicts with the goal of the plan to provide the insured an incentive to work if he can. And to the extent that LINA applied a sixty percent wage threshold internally, LINA did not consistently apply the literal language of the any-occupation definition of disability, which does not include any wage threshold. Only one of the five *Finley* factors does not weigh against LINA: LINA's interpretation does not conflict with ERISA's procedural or substantive requirements. Under

---

[24](...continued)
provision at issue both in *MacNally* and in this case, a provision that allows an insured to keep a portion of his benefits until he earns eighty percent of his pre-disability earnings, fits perfectly with the definition of disability in the *MacNally* policy.

Another provision of the policy in this case provides further evidence that the drafter did not attempt to reconcile the policy's definitions of disability with its other provisions: The policy provides that coverage ends when an insured "earns more than the percentage of his or her Indexed Covered Earnings which [is use]d to determine if an Employee is Disabled . . . ." Tab 56 at 225. Yet the policy does not define disability in terms of a percentage of an insured's Indexed Covered Earnings.

these circumstances, especially in light of LINA's conflict of interest in this case, the Court finds LINA's interpretation of the work-incentive-benefit provision to be unreasonable.

Accordingly, LINA abused its discretion in failing to apply an eighty percent wage threshold in determining whether Gordon was disabled during the any-occupation period of disability.  The work-incentive benefit effectively promises employees such as Gordon that they may work during the any-occupation period and still receive benefits as long as they earn under eighty percent of their pre-disability earnings.  For that reason, the Court agrees with Gordon that LINA erroneously used a sixty percent wage threshold in this case.

None of the six jobs identified in the June 2006 TSA paid eighty percent of Gordon's indexed pre-disability earnings.  Accordingly, even if Gordon were physically capable of doing those jobs, the TSA would not justify the denial of his claim for benefits.  This is a second, independent reason supporting the Court's finding that LINA abused its discretion when it denied Gordon's claim.

## C.  Prejudgment Interest

Gordon requests prejudgment interest at "the Minnesota state interest rate . . . ."  Pl. Mot. S.J. at 1 [Docket No. 34].  Prejudgment interest is available in ERISA cases if it is necessary to ensure that a plaintiff obtains appropriate equitable relief.  *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1219 (8th Cir. 1981).  Indeed, the Eighth Circuit has held that prejudgment interest should generally be granted unless exceptional circumstances render such an award inequitable.  *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986); *see also Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1331 (8th Cir. 1995) (holding, in an ERISA case, that "there are no exceptional circumstances that would make the award of prejudgment

interest inequitable"). But the interest rate is not set by state law; rather, it is determined in accordance with 28 U.S.C. § 1961. *See Mansker*, 54 F.3d at 1331.

The Court finds that an award of prejudgment interest is necessary in this case to provide appropriate relief to Gordon. Because the parties have not briefed the question of what interest rate applies, the Court defers consideration of that question. The Court encourages the parties to attempt to agree on how to calculate prejudgment interest, as well as on how to calculate the amount of benefits that LINA owes to Gordon under this Order.

### D. Attorney's Fees

Gordon seeks an award of attorney's fees. Whether to make such an award is within a district court's discretion. *Mansker,* 54 F.3d at 1329. The Eighth Circuit has identified five factors that courts should consider in deciding whether to award attorney's fees in an ERISA case:

> (1) the degree of culpability or bad faith which can be assigned to the opposing party, (2) its ability to pay, (3) the potential for deterring others in similar circumstances, (4) whether the moving party sought to benefit all plan participants or beneficiaries or to resolve a significant legal question regarding ERISA, and (5) the relative merits of the parties' positions.

*Id.* The Court finds that, on balance, these factors favor Gordon, and the Court therefore directs LINA to pay his attorney's fees.

LINA's behavior toward Gordon in this case was not that of a fiduciary acting in his interests and the interests of plan participants. Rather, LINA acted like a company that first decided to deny Gordon's claim and then went looking for evidence to justify that decision. Notably, although LINA considered seeking an independent medical examination in May 2006, it did not do so once it received the May 2006 PAA from Canfield. *See* Tab 15 at 42. LINA

- 42 -

then egregiously mischaracterized the PAA, both internally and to Gordon, to support its

conclusion that Gordon could do sedentary work.

Further, the analyses of Gordon's medical records by LINA's nurse case manager and its

medical directors were so cursory as to amount to mere rubber stamping.  The Court agrees with

*Gardner v. Bear Creek Corp.*, which labeled an opinion by Hall like the one in this case "an

analytic nullity."  No. C 06-02822 MHP, 2007 U.S. Dist. LEXIS 58615, at *51 (N.D. Cal. Aug.

6, 2007).  And the Court's holding is consistent with *Juszynski v. Life Insurance Company of

North America*, in which the court found that LINA took "a selective view of the available

evidence" and reversed LINA's denial of benefits.  No. 06-CV-5503, 2008 U.S. Dist. LEXIS

24928, at *39 (N.D. Ill. Mar. 28, 2008).

The evidence in the record is overwhelming that Gordon is incapable of earning a living.

Rather than view the record through the eyes of a fiduciary, LINA bent over backwards to find

an excuse — any excuse — to deny benefits to Gordon.  There is, for example, no evidence that

LINA gave a moment's consideration to the findings of its own vocational counselors and

outside consultants that Gordon was unemployable.  Instead, LINA relied on a purely

hypothetical TSA to conclude that Gordon could work.  LINA acted not as a fiduciary, but as an

adversary.  The Court awards Gordon his attorney's fees.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      LINA's motion for summary judgment [Docket No. 30] is DENIED.

2.      Gordon's motion for summary judgment [Docket No. 34] is GRANTED as

        follows:

a.   LINA is ORDERED to pay long-term disability benefits to Gordon for the period from June 1, 2006 to the date of judgment, in accordance with the terms of the plan, in an amount to be determined.

b.   LINA is ORDERED to pay long-term disability benefits to Gordon going forward, unless a termination of benefits is consistent with the policy as interpreted by this Order and justified either by a change in Gordon's condition or by new information about Gordon's condition.

c.   LINA must pay attorney's fees and costs in an amount to be determined.

   i.   No later than thirty days from the date of this order, Gordon must serve and file an affidavit documenting the attorney's fees and costs he seeks to recover.

   ii.   No later than fifteen days after Gordon serves and files the above-referenced affidavit, LINA may serve and file a response of no more than 4,000 words.

d.   LINA must pay prejudgment interest at the rate provided for under 28 U.S.C. § 1961.

e.   If the parties agree on the amount of benefits owed and the interest calculations, the parties must submit a proposed form of judgment no later than thirty days from the date of this order.

f.   If the parties disagree on the amount of benefits owed and the interest calculations, they must do as follows:

i.      No later than thirty days from the date of this order, LINA must serve and file an affidavit documenting its calculation of the benefits and interest owed to Gordon under this order.

ii.     No later than fifteen days after LINA serves and files the above-referenced affidavit, Gordon may serve and file a response of no more than 4,000 words.

Dated:  March 18, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge